May it please the Court? Good morning. My name is James Malone and I speak for the plaintiffs in this matter. With the Court's permission, I'd like to reserve two minutes of the allotted time for purposes of rebuttal. In this case, I would submit that the District Court should be reversed because of its conclusion that no notice was required under Section 204H of ERISA rested upon an unreasonable assumption that was unsupported by record, and its alternate holding that rescission was not appropriate is inconsistent with both the plain language of ERISA and with the facts of record. Let me make certain of one thing. Backloading is out of the case, am I correct? You're absolutely right, Judge Garth. Since we filed our opening brief, there was a rev ruling. If that rev ruling had been available when we were framing this case, we wouldn't have put backloading in. So we're talking only about the notice? That's all that's allowed? Okay. Can I just ask one preliminary question? I thought you made two age discrimination questions, did you not? I mean, allegations. When we initially filed the case, we did not have the benefit of the register case so that those were disposed of by the trial court. First, the 204B1H was disposed of squarely because of register and 204B1G is really a mirror image of the same thing. So the only things we appealed on were backloading and notice. We viewed those as dead letters by the time we were writing the notice. I thought there might be an argument that G was not precluded by register, but so be it. Okay, notice. Now the merger was 10 years ago and the amendment we're discussing today was almost 10 years ago, correct? That's correct, and we're going to respect January 1999. And the plaintiff filed a suit in 2005. And the issue really that the court grappled with was she said, I don't think that notice was required. The notice that you sent was deficient because it really didn't inform them that someone could possibly be worse off. But I'm not going to rescind here. But you don't get to notice unless you decide, that notice was required. I think that's the logical place to start. She first filed that there was no notice required. That's correct. So her notice determination, I suppose, was dictated. Nothing else, right? I viewed it as an alternate holding because I viewed it as wrapped up with the rescission, but I think it's fair to characterize it as a disconflict as well. Let's focus on the notice requirement because that's really the starting point, I think the logical beginning of this case. First question is- Because if she's right on that, you don't get the notice. That's correct. And that turns on- But you don't want to deal with that. No, I was trying to get to that right now. Wait a minute. I'm sort of lost. Don't you have to show as a precondition that there's a significant reduction in benefits before you can even challenge the adequacy and timeliness of the notice? Right. The notice is only required if the governing amendment is reasonably expected to change the amount of the future annual benefit as of normal retirement age. In other words, it's not a snapshot- Substantially. Substantially. Yeah, not just reduce. But substantially reduce the amount of the future annual retirement benefit at normal retirement age. So it's not a snapshot of what was my benefit on 12-31-98, the day before the effective date, and what is it on 1-1-99. The question is, what is my benefit going to look like under the new plan versus the old plan? And again, I'm lost. Is it substantial or significant? Significant. I think the language is significant. It's significant reduction. Okay, there's a difference. There is a difference. But what is my benefit going to look like when I get to age 65? And that, in turn, in this case, turns on what assumption do you make about future compensation under the plan? The district court went with the defendant's position, which was you should assume that there is no increase in compensation in making this determination and analysis of what is a particular plan- And your argument is that applies to backloading, but not necessarily to notice. That's correct. There's language in the backloading regulation that would clearly support that position. But the language of the notice requirement is all in terms of- It is the reason for that, that when you look at age discrimination, or I'm sorry, you're not backloading. You're looking at really age. You're factoring in age. And here, you're comparing two plans, and therefore, you're not factoring in age. I think it's a more historical difference, Your Honor. I think that when the backloading reg was put into place in the early 70s, virtually every plan was a final average age plan. And if you took into account an assumption about salary growth, you were going to invalidate the very plans that they were trying to say were good plans. Here, the 0% assumption is what the court adopted. And we submit that there's really no support for it in the record. And the standard for notice was one of reasonable expectations taking into account the relevant facts and circumstances as they exist as of the date of the amendment. There's nothing in this record to suggest that anyone at either Delmarva or Atlantic City Electric was thinking about a 0% growth rate. But what there is in the record is the fact that for financial reporting purposes, the companies were using a 4.5% annual growth rate. That's what they put in their K-1s. For the 10K reports, that's correct. 10K, I'm sorry. And that there also are slides from the Watson Wyatt consultants who worked to design the plan that Mr. Wilkinson testified he had met with them. And those PowerPoint slides, which appear in volume three at page 811 of the joint appendix, use a 3% growth rate. So there's nothing to suggest that 0 is the right number. And we've given you an example in our reply brief, which I think really helps illustrate this. If you take 0 as the right example, you could radically change the average compensation period in a traditional defined benefit plan, but it wouldn't have any effect because there would be no salary growth. We used the example of a plan that went from a five-year final average to a 10-year final average. And when you assume 0% in there, it really makes no difference. But that's precisely the type of change in the structure of the defined benefit plan that the IRS says may, in a particular case, be the subject of a required 204-H notice. So we don't think there's any support for the 0%. We offered two different alternative mechanisms. We said, well, the 4.5% that you were using in your financial statement, and we offered an analysis based on that. And we also offered an analysis that looked at what the earnings were of these particular four plaintiffs and took an average from that. Now, as with any average, what those numbers mean is they're all over the map. I think Mr. Charles was about 6% growth. Mr. Fink was at the other end of the extreme, and he was about 1.6% growth. But those were the alternatives. Well, let's assume you're right on the law on that. Would you address the timeliness and then the adequacy then? Sure. Let's assume for the moment, just assume that there was a significant reduction in benefits. How was this untimely, the notice that was given? Well, I think the notice was deficient. But to focus simply on the time in question. No, we'll deal with adequacy next. Right. The requirement at the time was that you had to issue notice after the plan was adopted and 15 days before the effective date. And the question then becomes, on this record, what constituted the adoption of the plan? Now, the defendants took the point of view that there was a resolution at the board level adopting the plan and that that was sufficient. On April 23rd. Correct. 1998. And if that's... Ten years ago. If that is the correct line in the sand, and if we credit the testimony that the facts document, which is not really ever dated, and which was apparently issued sometime in the spring, then timeliness is met. Our problem with looking at that date as the date when the plan was adopted is pretty simple. That if you actually look at the document that they were approving, all they had was seven bullet points. No one could look at the seven bullet points and tell, for example, how it is that their benefits were going to be calculated. So our concern with that document was, is it conceivable that you can amend a plan by means of a resolution? Yes, absolutely. That's the Schoening-Jungen case and that's very well established. But is this particular resolution under these circumstances enough? We didn't think it was. And we hear the argument that, well, you can go back and look at the predecessor plan, but there were two different plans. And we're talking about a fairly radical restructure. Yeah, but they both permitted there to be a committee formed and a committee to adopt. The board of directors, you know the language. I know exactly what you mean. If this resolution had been more specific in the terms of what they approved, we probably wouldn't have made the timing argument. But that's your argument. Exactly. Our concern is that, okay, well, let's accept the principle that, yeah, a board of directors can amend a plan if the plan says they can. And can do it by resolution and can delegate that responsibility. Fine so far. But when I look at the resolution and I see bullet points that say things like extensive grandfathering, without saying who or what or under what circumstances, or things like there's no crediting rate set forth, you can't tell what the pay scale is going to be or any of those factors, I don't think that particular document's enough. But I'd really like to focus on, which is the core issue was, whether this notice was sufficient. And I think it's important to understand that the notice that these people were provided was very different from the notice that was in front of this court and register. Because the sponsor and register did its job. The sponsor and register told the participants. That there may be a reduction in your benefits. Exactly. Yeah, but the register said you don't have to do that. No, what register said. No, no, no. Register says, contrary to, I'm quoting, contrary to appellant's arguments, the treasury regulations at the time of the amendment, same that are applicable here, were clear that the employer was not required to discuss how the individual benefit of each participant or alternate payee will be affected by the amendment. Correct. The individual benefit of each participant. This notice didn't tell anyone that any different about this notice. All register requires, and tell me if I'm right or wrong on this. You know you have to say I'm right. All register requires is that the notice requirement set forth the amendment and the effective date. Correct? I don't read register that way, Your Honor, respectfully. And I don't think the reg provides that. Because the reg provides that. I'm talking about register. Register specifically noted the language that I quoted, which is that the statutory language appeared in the notice of register. The plaintiffs wanted more than that. The plaintiffs in that case wanted to say not only should it tell me that some people under some circumstances may be worse off, it should provide more. Our notice doesn't say anyone could be better off. Let me just quote again from register. We hold that the brochure satisfied ERISA's notification requirements because it, quote, set forth the plan amendment and the effective date. That explanation was all that was required, end quote. That comes right after they explain that the notice indicated explicitly that some people And there's no we hold, by the way. I only started the quotes before set forth. All right. And think about this for a second. Think about what the purpose of this notice was. You're supposed to send this notice out when there's going to be expected a substantial decrease or a significant decrease in the rate of future benefit approval. You're talking about one of the most complicated kinds of financial structures known to man. You're sending it out to the general populace. The treasury reg says write your summary in a fashion that can be understood by the ordinary average plan participant. No, you don't have to tell each one how they are going to be affected, but I think the would lead someone to conclude, you know what? I might be worse off under this plan, and maybe I should do something about it. Maybe I should go to my supervisor and complain about this plan. Maybe I should look for another job. Maybe I should be starting to put more away. You would be a lot better off if the register hadn't been filed. Absolutely. There's no dispute for me on that. I mean, I know the lawyers. Judge Greenberg did you in to a certain extent. To some extent, but I think I'm very much alive here in Newark and happy to be here. Everyone's happy to be in Newark. And I understand the concern that the panel has. We're going back an awfully long time, but think about it from the perspective of the planners. The testimony was pretty consistent. The package that they got talked about all the benefits of the new arrangement. There's going to be a better death benefit. There's going to be more portability. It's going to be easier to understand. It didn't say anything bad could happen. Well, it did. The brochure actually said, where they explained the grandfathering and talked about the grandfathering, and it said that their pensions would be calculated under old and new plans and they would receive whichever value is greater. So implicit in that is there could be a value that is lesser. So in a sense, they were told. But that was for a distinct group of people. That was for people that were at a particular point of age in service, that that provision, that related to the grandfather. None of these people were grandfathers. So what happened to them was that they went along, and then suddenly people who were grandfathers started to leave. And the time frame of that was in or about 2004. And the four plaintiffs in the case started talking to their colleagues, and their colleagues would say, boy, we got both numbers. You should see the differential. It's huge. And that was what made them understand that, no, this amendment wasn't all good. Yes, it's portable. Yes, there's a better death benefit. Yes, it's easier to understand. But this amendment may result in my having less retirement age. If we were to agree with you that there's a problem here and we send it back, wouldn't there have to be a determination of statute of limitations or something? This case, this plan was in existence for I think it was five years before your action was filed, correct? I believe it would have been six and a half. I think we filed the initial complaint in September 2005. The plan went into effect January 1 of 1999. The plaintiffs got their information packages that would tell them what their opening balance was. There was an awful lot of information out there about the problems with these cash balance plans and how they were more harmful to the older worker, et cetera, et cetera. I mean, there's an awful lot of information out there such that you might have a very tough time. It's important to go back. In other words, there might have been storm warnings that you should have looked at it sooner. Except that the employer enrolling the plan out had meetings, Your Honor, in which they said, you know, there are these articles out here in the Wall Street Journal, but our plan's different. Our plan's better. Our plan pulls together the best of the final average pay plan and the cash balance plan. To the extent there were storm warnings. There was no duty to inquire with all the stuff out there. I know that's not an issue that's now before us. When were the Wall Street Journal articles? There were Wall Street Journal articles that were contemporaneous with this coming out. Yeah, 1998. There are a bunch of them as early as 1998. In fact, maybe a little bit earlier. But the plans are not potatoes in a bin either. No. Arisa is a complicated subject that scares most lawyers to impose on a plan participant the ability to understand and take his cash balance lump sum and turn that into an annuity value is to ask an awful lot. I mean, these people got annual statements, but the annual statements, and we have an example for you somewhere in the record from Mr. Ward, they just give you the lump sum number. You don't have the annuity amounts. You don't have the ability on a running basis to say, oh, here's what I had under the old plan. Here's what I have under the new plan. The new plan was all hypothetical accounts, aren't they? Correct. And it was only presented as lump sum. Do I understand your position to be that if we were to be attracted to your notice argument that we would then have to remand for determination as to whether or not the statute of limitations barred your action? I think that that's probably the right result. I would love to have you reach out and decide that, but I understand the reticence that you have. You don't have a full record. You have some preliminary indications of what the district judge's concerns were, but we haven't briefed it and developed it the way we would. If, for example, she had said, you're right, the notice is deficient. You're right, it was required, but you guys waited too long. You'd have a very different record. I recognize that. Thank you. Thank you. Thank you. Susan Hoffman for Pepco Holdings, and I am a New Jersey native, so I'm glad you brought me back here. Let me start off at the beginning with you. The board said in, what, March of 98, that the Compensation and Personnel Committee should look at this issue, and did they not then say that whatever you do, don't have any significant expenditures, is that correct? They had the authority to adopt benefit plans that did not significantly increase the cost to the company. And they met on April 23 of 98, and they adopted this seven bullet points. Did they approve that? That is correct. And they came out with a newsletter and a kit, if you will, in the following month of May. Right, with very, very substantial details. Was there anything, and I read it pretty carefully, is there anything in there that said that a cash balance plan may, for those who were under 50 with less than 20 years of experience, be less than the old plan? Yeah, be less than the old plan. There was not. And part of the reason is that whether it would be worse really depended on what happened, because what you have is an immediate increase in everyone's accrued benefit, because all of the early retirement subsidies that were already accrued had been folded into the initial cash balance. So wouldn't it have been helpful to do then what was done in register that says, quote, and in some instances may reduce the rate of future pension plan benefit accruals? That might have been helpful, but it wasn't required. Because? Because all that was required, first of all, if there was a significant reduction in the rate of future benefit accrual for some participants, if they had the right pay increases, what would have been required was a description of the amendment and its effective date. 204H was changed sometime later to require exactly what you're saying. Congress recognized that it would be useful to have more than just a description of the amendment and its effective date, and they changed 204H to require an individualized statement of what would happen to people. But at the time, 204H did not require that, and register clearly held that. But in register, again, in some instances it may reduce. Everything I've looked at, at least the numbers that we've run, show that the cash balance plan would be less than the old plan for those under 50 with fewer than 20 years of service. The only evidence that plaintiff presented, and plaintiff had the burden of proof to present evidence showing there was a significant, there could be expected, a significant reduction in the rate of future benefit accrual. And they used a 4.5% interest assumption at a time when. Which is what you use on your 10Ks. But the interest assumption, as our expert actuary said, is one of many assumptions, including a plan earnings assumption, what you might call your interest rate. And the two have to match. The interest rate in the 10K was higher than the 5% that the cash balance plan was. Did they do the math by keeping the numbers, do the comparison by keeping the numbers constant, or did they actually take into account that there would be, pick whatever number you want, 4.5 or some type of. Well, remember that the 10K was aggregating the entire workforce. Most of the workforce was unionized. And most of the workforce. And by the way, the unions, just to digress for a second, the unions didn't accept this, did they? No, they didn't. And the reason was? I can't speak for the unions. What would be the guess? That it was, they were not getting as good a deal? Well, I will tell you that the cash balance plan eliminated, and the reason that the plaintiffs saw the big differences when their friends were retiring, is that the Atlantic Electric plan had an unreduced benefit at age 55 with a lump sum. An unreduced benefit at age 55 is an enormous early retirement subsidy. That subsidy, in terms of future approvals, went away with the cash balance plan. But 204H does not protect, at the time, a reduction in early retirement subsidies. It only looks at normal retirement benefits. And Mr. Craw's analysis showed that using a no pay increase assumption, all the plaintiffs were substantially better off under the pay increase assumption if they worked age 65. They certainly would not have been better off if they retired at 55. But that is irrelevant under 204H. It seems to me that if you get no, a better benefit with a no pay increase assumption, and a slightly worse benefit. Remember, Mr. Pollin said there was a 29% increase. Was the court correct here, the district court correct, in saying that the comparison should be done, as you do with backloading, with constant numbers? Was the court correct on that? I don't know. And I'm not sure it matters. I would like to say she was correct. It's not an unreasonable assumption. Just take, for example, the Seventh Circuit case, Cooper of Judge Easterbrook. It would be ludicrous not to assume that there is growth in earnings. That's the way America works. Judge Ambrose, I will accept your premise that it is reasonable to assume some pay increase. We know that if you assume no pay increase, the cash balance plan is better. If you assume 4.5, which was almost the amount of the interest crediting rate, and those two numbers aren't usually that close. But if you assume 4.5, you know there's something like a 22% decrease. Now, Toland said 29% decrease, but he was comparing the cash balance to the old plan. You're supposed to do it the other way around. It's like if you were 100 under the old plan and 75 under the new, that's a 25% decrease. He would have said, oh, that's a 33% decrease, because you go from 75 to 100. But if there's a 28% decrease for backloading, and we're talking about the notice here, that has to be significant, right? Right. So let's say it's 23% with 4.5. Somewhere in the middle, between 0 and 4.5, there's a number where they're exactly equal. And it seems to me that if there's a decrease at all, depends on what your pay increase assumption is, that's not a significant reduction. And I think that's a decision this court could make. Now, let me go back to in May, you put out this kit and you put out a newsletter. Yes, let me go back. Has the plan been adopted by that time? Yes, let me give you an example. Which plan? The plan that was adopted. Once that newsletter went out, which the testimony was, it wasn't going to go out until the board had, the committee had voted. The committee voted, the fax newsletter went out, the decision kit went out, with great detail. And on January 1, 99... I've read it, and I don't consider it great detail, but the great detail I see... But it was enough to calculate your cash balance. And on January 1, 99... It was? Yes. Okay. And on January 1, 99, all these plaintiffs had much higher benefits. If in February, Mr. Charles had quit, and the company had said, oh, no, we didn't adopt that plan yet, you don't get your higher benefits. But my point is different. It would be awarded. My point is, when you unveiled, in December of 99, the full 20-page amendment... Yes. When did you unveil that at any time prior to January 1, 99? All of the details in the fax newsletter and in the decision kit were contained in that plan document. The only differences are that if you look at the plan document, you'll see there are special provisions for little groups. But there's nothing in the newsletter or the decision kit that says that it is possible that you may be less, unless your grandfather, that is, you're over 50 or greater than 20 years of service, unless your grandfather, you will get less. That's correct. You will get somewhere, you were saying maybe 23% less. That is correct. It did not say that, but it was not required to say that under the laws that then existed. The laws that now existed would require that. But how can you put something out and say that it's effective January 1, this is what we've approved, when all you have is a concept? I mean, it's like, for instance, this past weekend, Secretary Paulson and Chairman Bernanke come out with a proposal. Right. But it hasn't been adopted yet. Yes. Only Congress can adopt it. And in this case, only the committee could adopt it, and the committee did adopt it. There are many cases. Where are the minutes of the committee that say, we adopt this 20-page amendment? In Hagler v. Signacorp, there was one line in a board resolution adopting a new benefit formula. The final document wasn't finalized until five years later, and the District Court of Florida in Hagler found there was a valid amendment when that board resolution was passed. So you can adopt the general concept, put out a general concept, seven bullet points, put out a newsletter, and then have a complete 20-page amendment later on, 12 months, 11 to 12 months, after it's the effective date. You tell me that's okay? It is, because it takes a while to find the little people who don't fit the general amendment. And that's the reason for the delay. It's those little groups who went from one group to another. So then shouldn't you have delayed the effective date? All those people got higher benefits. The special provisions that went into the plan for them are higher than the original plan would have provided. So whatever was different in the final plan document was an improvement, not a decrease. Why do you no longer place your new employees into this cash balance plan if you don't? Because Connective was acquired by Pepco Holdings, which is a Washington-based utility. Pepco had an existing defined benefit plan similar to the Atlantic City Electric and the Delmarva. They adopted a new plan for every new hire which does not have early retirement subsidies, and all new hires go into that. So it's similar to what Connective did with Pepco. When Pepco took over, I think 2002, that was when this would... Yes. Just to be absolutely certain, this cash balance subplan is still in effect. It is still in effect. Hope springs eternal, I thought perhaps. There are now, I think, five subplans in what is now the Pepco Holdings plan. How many employees are affected by this? If the union people are out... I think it's about 300. So what are these, like mid-level management? This is all management employees from Atlantic City Electric and Delmarva, except for new hires since the Pepco. And so the new thing went into effect so that you don't apply it to new employees after what date? 2002. I think Pepco... I think it may have been 2004. I'm not sure. I'll tell you in a minute. I would like to address the question of whether the statute of limitations... 2002 is when Connective became a subsidiary of Pepco. Right. It was some time after that. I would like to briefly address the statute of limitations issue, which I think this court could dismiss, uphold lower court on any of three grounds, either on the grounds that there was not a significant reduction, on the grounds that the notice was adequate, or on the grounds of the statute of limitations as far as they're claimed. Judge Robinson didn't really make a finding on that. No, she didn't. And the trouble is you really get hung up as to whether there really had to be a lot of discovery when they could reasonably have been expected to find that out. There's a good argument it should have been in 98. There's a good argument that, in fact, these folks wouldn't have known until 2004 when they actually found out. And I don't know the answer to that. Each of them expressed a personal concern or knowledge about the fact that they didn't think the cash balance plan was fair. One of them, in fact, had an email with three articles about the Wall Street Journal and how terrible cash balance plans. He initially denied having received them, but finally had to admit that they were, in fact, in his own email archive. They were all highly suspicious. They never followed up on their suspicions. And in that sense, this is very similar, I think, to the Jacquemus versus Hoffman-Laroche case where the claim accrued when plaintiffs were notified of their termination, even though there was no basis at that time for them to know of an adverse benefit impact. And I think in Sattel versus Kirwan Financial Group, they're on inquiry notice whenever circumstances exist that would lead a reasonable person of ordinary intelligence through the exercise of due diligence to discovery of the injury. So you don't have to know about the injury, but you have to have the suspicion and follow up on it. Are there no more questions? Thank you, Your Honor. Thank you. There's two pieces of evidence that I'd like to highlight on the question of the impact of this plan that I didn't get to at the outset and I should have. One's retrospective. It's after the fact. We know what the impact is because it's been disclosed in the financial statements that they filed in their 10-K a footnote that said, if the plaintiffs prevail, our accumulated benefit obligation and our projected benefit obligation will increase by $12 million. So that right there puts numbers, parameters, and shows an impact. More significantly, though, because you may say, well, yes, Mr. Malone, but that's hindsight. The fact is that they were looking for cost savings. And Mr. Wilkinson described a meeting they held at which they were going over the elements of the plan, and the PowerPoint slides from that are part of the record. We're starting at JA 926. Now, what's interesting about those slides is this. There's a bar graph, page 930, if my memory serves, that shows Atlantic City Electric, Delmarva, and Connective. Connective's going to be at $0.10 on the dollar. Atlantic City Electric's at $0.122 on the dollar. And Delmarva was somewhere in between. I want to say $0.109, but that's, you know. The elements of that were threefold. They were the pension plan, they were the 401k plan, and they were the post-retirement benefits. And the defendants have always argued consistently. Their testimony, that's their story, and they're sticking to it. But my concern is it doesn't hang together. Because when you look at those slides, what you find is they were increasingly matching the 401k plan. The post-retirement health benefit was staying the same. But nonetheless, they were going to wring changes and cost cuts out of this process from those three elements. So to me, right there, those slides at that meeting show that in their minds, they were looking for benefit cuts. I see my time's up. Thank you very much for the privilege of appearing. Thank you. Again, extremely well-argued case. We will take it under advisement. We will hear argument in the United States.